# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEROY WILLIS, Jr.,<br>Booking #7770645,<br>CDCR# H-36974,<br><br>                     Plaintiff,<br>     vs.<br>STEVEN RITTER,<br>LAURA RAUPE,<br>N. GRANNIS;<br><br>                     Defendants. | Civil No. 04-2303 WQH (JMA)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56(c)**<br><br>**[Doc. No. 84]** |

## I.

### PROCEDURAL BACKGROUND

On November 16, 2004, Leroy Willis Jr. ("Plaintiff"), currently detained at the San Diego Central Jail, filed this civil rights action in pro se pursuant to 42 U.S.C. § 1983, while he was incarcerated at Richard J. Donovan Correctional Facility ("RJD") in San Diego, California. Currently pending before the Court is a Motion for Summary Judgment filed by Steven Ritter, Lori Raupe (erroneously sued as Laura Raupe) and Nola Grannis ("Defendants") pursuant to FED.R.CIV.P. 56 [Doc. No. 84].

The Court has notified Plaintiff of the requirements for opposing summary judgment pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154

1  F.3d 952 (9th Cir. 1998) (en banc) [Doc. No. 86].[1]  In response, Plaintiff has filed several
2  documents, supplemental briefs and memos in Opposition [Doc. Nos. 89, 91, 94, 97, 99], to
3  which Defendants have filed a Reply [Doc. No. 95].

4  While this case was randomly referred to the Honorable Magistrate Judge Jan M. Adler
5  pursuant to 28 U.S.C. § 636(b)(1)(B) for disposition, the Court has determined that a Report and
6  Recommendation regarding the disposition of Defendants' pending Motion for Summary
7  Judgment is unnecessary.  *See* S. D. CAL. CIVLR 72.3(a).  Having now exercised its discretion
8  to consider the matter as submitted on the papers without oral argument pursuant to S.D. CAL.
9  CIVLR 7.1.d.1, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment
10  pursuant to FED.R.CIV.P. 56(c) for the reasons set forth in detail below.

## II.

### FACTUAL BACKGROUND

### A.  Plaintiff's Allegations

In his Amended Complaint, which is not verified under penalty of perjury,[2] Plaintiff claims Defendants Steven Ritter, D.O., who is the Heath Care Manager/Chief Medical Officer ("CMO") at RJD, Lori Raupe, an inmate Appeals Coordinator at RJD, and Nola Grannis, Chief of the California Department of Corrections and Rehabilitation ("CDCR") Appeals Branch, violated the Eighth Amendment's proscription on cruel and unusual punishment as well as the Americans with Disabilities Act ("ADA") by failing to provide, or ensure through inmate

///

---

[1] *Klingele* and *Rand* require the district court to ensure that a pro se prisoner has been given "fair notice ... of the requirements and consequences of a summary judgment motion." *County of Los Angeles v. Beltran*, 514 F.3d 946, 952 (9th Cir. 2008) (citing *Rand*, 154 F.3d at 960-61).

[2] While Plaintiff writes on the bottom of his Amended Complaint that it is "[a]ll said to be true," (Amend. Compl. at 8), his pleading does not conform with 28 U.S.C. § 1746; therefore, the allegations contained therein cannot be considered as a sworn affidavit in opposition to summary judgment under FED.R.CIV.P. 56.  *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).  In addition, to the extent that only *one* of Plaintiff's five separate submissions in opposition to summary judgment [Doc. No. 97], is titled as a "Declaration" and is signed "under penalty and [sic] perjury," it may be considered an affidavit for purposes of opposing summary judgment only to the extent it contains sworn statements "based on personal knowledge and ... it sets forth ... requisite facts with specificity.'" *California Pro-Life Council v. Randolph*, 507 F.3d 1172, 1176 (9th Cir. 2007) (quoting *Moran v. Selig*, 447 F.3d 748, 760 n.16 (9th Cir. 2006) (citation omitted)).

grievance procedures, adequate medical care beginning in May 2002. (Amend. Compl. [Doc. No. 5] at 1-5.)

In his Amended Complaint, which is far from lucid, but liberally construed,[3] Plaintiff claims to suffer from dilated cardiomyopathy, a heart condition.[4] Plaintiff specifically refers to a July 11, 2002 diagnosis conducted at Alvarado Medical Hospital, in support of his claim that CMO Ritter "displayed intentional deliberate indifference to a delay in a[n] organ transplant." (*Id.* at 4.)

The only documentary evidence of the July 11, 2002 diagnosis is an excerpt from Plaintiff's medical records, submitted as an exhibit to Plaintiff's *original* Complaint. (*See* Compl. [Doc. No. 1] at 11.) This exhibit, which appears to be one page of a multi-page "Interventional Cardiac Procedure Report," indicates that Plaintiff was admitted to Alvarado on July 11, 2002, where he was examined by Kevin Rapeport, M.D. Dr. Rapeport described Plaintiff as:

> [a] 44-year old male with congestive heart failure, with known drug abuse, smoking and sarcoidosis. The patient requires cardiac catheterization to rule out cardiomyopathy, ischemic heart disease and [an] endomyocardial biopsy to rule out sarcoid heart disease.[5]

///

---

[3] On January 9, 2007, after Defendants had filed an Answer to Plaintiff's Amended Complaint [Doc. Nos. 5, 12], Plaintiff submitted a 2-page document entitled "Amend Complaint" [Doc. No. 41], without first being granted leave to amend pursuant to FED.R.CIV.P. 15(a). In response, Defendants filed an "Answer to Second Amended Complaint" [Doc. No. 59], only to withdraw that Answer on July 13, 2007, after Magistrate Judge Adler conducted a telephone conference during which Plaintiff confirmed that the operative pleading in this matter is the First Amended Complaint filed on February 8, 2005 *nunc pro tunc* to February 3, 2005 [Doc. No. 5], not the "Amend Complaint" [sic] filed on January 9, 2007 *nunc pro tunc* to January 4, 2007 [Doc No. 41]. *See* March 29, 2007 Amended Case Management Conference Order [Doc. No. 48] at 7.

[4] Cardiomyopathy is "any structural or functional disease of heart muscle that is marked especially by hypertrophy of cardiac muscle, by enlargement of the heart, by rigidity and loss of flexibility of the heart walls, or by narrowing of the ventricles but is not due to a congenital developmental defect, to coronary atherosclerosis, to valve dysfunction, or to hypertension." MERRIAM WEBSTER'S MEDICAL DICTIONARY, available at http://medical.merriam-webster.com/medical/cardiomyopathy; *see also* Pl.'s Suppl. Response in Opp'n [Doc. No. 91] at 10-12.

[5] Sarcoidosis is "a chronic disease of unknown cause that is characterized by the formation of nodules resembling true tubercles especially in the lymph nodes, lungs, bones, and skin." MERRIAM WEBSTER'S MEDICAL DICTIONARY, available at http://medical.merriam-webster.com/medical/sarcoidosis.

1  (Compl. at 12, "History and Physical" dated 7/11/02.) Dr. Rapeport further noted that the "full
2  risks, benefits and alternatives including the risks of MI, CVA, bleeding, infection, arrhythmia
3  and death [were] discussed in detail with [Plaintiff] by ... Dr. Sun as well as myself and the
4  patient consent[ed]." (*Id.*)

5  Thus, on July 11, 2002, it appears Plaintiff underwent a right and left heart
6  catheterization, a "selective left and right coronary angiogram," and a left ventriculogram" with
7  "no complications" and "minimal blood loss." (*Id.* at 11, 30-31 "Interventional Cardiac
8  Procedure Report" and "Procedure Note" by John Mazur, M.D., re Endomyocardial Biopsy
9  dated 7/11/02.) While Karl Sun, M.D. acted as Plaintiff's admitting physician, an
10 endomyocardial biopsy was taken by Drs. Rapeport and John Mazur. (*Id.* at 11, 30.) The
11 results of this biopsy, dated July 12, 2002, and also attached to Plaintiff's original Complaint,
12 showed "moderate myocyte hypertrophy with focal interstitial fibrosis" but were "negative for
13 active myocarditis and granuloma."[6] (*Id.* at 23 "Surgical Pathology Report.")

14 Plaintiff filed a CDC 602 inmate appeal challenging the sufficiency of his medical care
15 after the 2002 biopsy. (*See* Compl. at 9-10 "Director's Level Appeal Decision," Log No. RJD
16 03-1274.) Defendant Grannis, as Chief of the CDCR's Inmate Appeals Branch, denied
17 Plaintiff's grievance on February 24, 2004. (*Id.*) In his CDC 602, Plaintiff claimed that the
18 "heart biopsy performed in 2002 indicate[d] heart problems for which he [wa]s not receiving
19 appropriate treatment." (*Id.*) Plaintiff requested to "be seen by a specialist" and "someone
20 other than Dr. Sun at the Alvarado Hospital" based on claims of a "racial conflict of interest."
21 (*Id.*)[7]

22 At the second level of appeal review, Plaintiff claims Defendant Raupe, in her capacity
23 as the medical appeals reviewer, "intentionally denied [him] medical care" by refusing

24

---

25 [6] Myocarditis is "inflammation of the myocardium," which is the middle muscular layer of the heart wall. MERRIAM WEBSTER'S MEDICAL DICTIONARY, available at http://medical.merriam-webster
26 .com/medical/myocarditis. Granuloma is "a mass or nodule of chronically inflamed tissue with granulations that is usually associated with an infective process." *Id.* at http://medical.merriam-webster
27 .com/medical/granuloma.

28 [7] Dr. Sun is not named as defendant in this action.

Plaintiff's request to "visit to a[n] outside clinic other than Alvarado." (*Id.* at 5.) Plaintiff alleged Raupe was "aware at the time" of the seriousness of his cardiomyopathy and "lung disease sarcoidosis" and that her decision "could possib[ly] lead to [Plaintiff's] death." (*Id.*)

According to Plaintiff's Director's Level Appeal decision, Raupe "found that [Plaintiff] was referred for a cardiology consultation" on April 25, 2003, where he was found to be "clinically stable," and that after the consult, Plaintiff was monitored at RJD by a Dr. Hunt. (*Id.* at 9.) Raupe indicated that Dr. Hunt "had been seeing [Plaintiff] on a regular basis," and that if he required "further specialty visits the facility physician [would] request a referral." (*Id.*)

Plaintiff appealed Raupe's decision; however, his grievance was denied at the Director's Level by Defendant Grannis because Raupe's review of Plaintiff's medical records and history showed he "had received medical care in accordance with [CDCR] regulations," specifically CAL. CODE REGS., tit. 15 § 3354, and because there was "no evidence ... to substantiate [his] allegation that Dr. Sun from Alvarado Hospital ha[d] a racial conflict of interest."[8] (*Id.*) Plaintiff claims Grannis, with "evil intent," denied his rights under the ADA in his capacity as Chief of Inmate Appeals because by denying his grievance on or about February 24, 2004, Grannis was "made aware that [Plaintiff] has a chronic heart and lung disease," yet nevertheless refused to permit him access to "another doctor other than Dr. Sun for [a] second opinion" concerning the July 11, 2002 biopsy conducted at Alvarado. (*Id.* at 6.) Plaintiff also includes reference to his need for a "cardiac diet," under the ADA but, like his claims related to the need for an organ transplant, he offers no further elucidation and points to no evidentiary support for such a claim.[9] (*Id.*)

---

[8] CAL. CODE REGS., tit. 15 § 3354(a) provides that "[o]nly facility employed health care staff, contractors paid to perform health services for the facility, or persons employed as health care consultants shall be permitted, within the scope of their liscensure, to diagnose illness or, prescribe medication and health care treatment for inmates. No other personnel *or inmates* may do so." (emphasis added). Plaintiff's Director's Level Decision further advised Plaintiff that, pursuant to this regulation, "[i]t is not appropriate for [Plaintiff] to self-diagnose his own medical problems and then expect a medical doctor to implement [his] recommendation for a course of medical treatment." (*See* Compl. at 9.)

[9] The only reference the Court can find in the record regarding a cardiac diet is a Memorandum written by Defendant Ritter to the Osteopathic Medical Board of California in response to a complaint filed by Plaintiff which was also attached to his original Complaint. (*See* Compl. [Doc. No. 1] at 13.)

Finally, Plaintiff objects to inadequate medical treatment performed during or after another "outside clinic visit" to Alvarado in April 2004, and concludes that CMO Ritter "refused to correct" his shaking and chest pain and denied him relief in the form of surgery he claims was required to repair "leaks" in his heart valves. (Amend. Compl. at 4; Compl. at 18.) The only evidence in the record that appears to coincide with this allegation is an exhibit attached to Plaintiff's original Complaint entitled "Echocardiogram Report" and prepared by the Rapeport Medical Corp. on April 29, 2004. (Compl. at 18.) Defendant Ritter also references Plaintiff's April 29, 2004 referral to Alvarado in his response to a complaint Plaintiff appears to have lodged with the Osteopathic Medical Board of California. (*Id.* at 13, Ritter Memorandum dated May 14, 2004.) In this memo, Ritter explains Plaintiff's medical history as follows:

> Inmate-patient Willis arrived at RJ Donovan Correctional Facility on May 3, 2002. He was evaluated and treated appropriately. He presented with a history of Sarcoidosis, congestive heart failure, back pain and blurring vision. Since his initial visit he has been seen routinely by our Staff physicians on the various yards. In addition, referrals were made to various specialists including cardiologists, [a] pulmonologist, ophthalmologist and a dermatologist.
>
> Inmate-patient Willis has undergone two ECHO cardiograms, has had a heart cauterization, endomyocardial biopsy, myocardial perfusion stress test, multiple chest x-rays, spirometry, EKGs and a chest CT. He was last seen by a cardiologist on April 29, 2004 and by ophthalmology on January 21, 2004. His current diagnoses are pulmonary and ocular sarcoidosis, cardiomyopathy secondary to polysubstance abuse and mental health issues.

(*Id.*)

Based on these allegations and exhibits, Plaintiff seeks an injunction directing Defendant Ritter as Chief Medical Officer to "schedule him for an examination with UCSD for CT scan [and an] MRI." (Amend. Compl. at 8.) Plaintiff also seeks $250,000 in general and punitive damages against all Defendants. (*Id.*)

---

In this memo, dated May 14, 2004, Ritter explains that the CDCR's Operations Manual § 54080.6, governing inmate diets, states that "The CDC[R] food plan and standardized department-wide menu for a low fat, "Heart Healthy" diet shall be followed by all institutions for all standard meals." (*Id.*)

### B.     Defendants' Response

Defendants' Motion for Summary Judgment does not specifically address the allegations in Plaintiff's Amended Complaint. Categorizing Plaintiff's claims as "almost undecipherable," however, Defendants do acknowledge Plaintiff suffers from cardiomyopathy and lung sarcoidosis, and that "at issue" are Plaintiff's claims of: 1) delay related to an organ transplant, 2) denial of adequate medical attention and access to an outside medical clinic, 3) ADA violations, and 4) an alleged failure to provide a cardiac diet. (*See* Defs.' Motion [Doc. No. 84] at 4.)  In support of their Motion, Defendants they have filed a "Separate Statement of Undisputed Material Facts," which incorporates the Declaration of Franklin L. Murphy, M.D., a doctor designated as their expert pursuant to FED.R.EVID. 702.  (*Id.* at 3, 8-11.)

Defendants rely on Dr. Murphy's Report and Declaration to flesh out the details of Plaintiff's condition and history of medical treatment.  Based on Murphy's review of Plaintiff's medical records, including those provided by Dr. Rapeport, from UCSD Medical Center and Alvarado Medical Center, Plaintiff was first "diagnosed with Sarcoidosis (confirmed with liver biopsy) in childhood when he presented with uveitis."  (*Id.* at 26-27 (hereafter "Murphy Report").)  Plaintiff was treated "on and off" for this condition with steroids, and while incarcerated, was referred for CT scans at Alvarado Hospital on January 16, 2002, July 15, 2002, and August 25, 2004, all of which showed "findings consistent with this diagnosis." (*Id.* at 26.)  Murphy also noted Plaintiff's "long history of polysubstance drug abuse including methamphetamine, cocaine and alcohol," as well as high blood pressure.  (*Id.*)

On February 11, 2002, Plaintiff underwent cardiac catheterization, coronary angiography and a cardiac biopsy at UCSD Medical Center.  Plaintiff was found to have a "depressed left ventricular ejection fraction ("LVEF") of 40%, [and] normal coronary arteries."  The biopsy was "negative for amyloid, hemochromatosis and sarcoid."  (*Id.*)   On February 16, 2002, Plaintiff was admitted to UCSD with congestive heart failure, but treated and discharged with medication, including Benazapril, Coreg, Bumex and ASA, which Dr. Murphy claims were "all appropriate for his condition."  (*Id.*; *see also* Compl. [Doc. No. 1] at 14 "UCSD Healthcare Echocardiogram Report" dated 2/19/02.)   Dr. Murphy further reports "multiple

1 echocardiograms to evaluate [Plaintiff's] cardiac function" were conducted after his February
2 2002 hospitalization, including one on June 28, 2002, another on April 29, 2004, and another
3 on October 28, 2007.  (*See* Murphy Report at 27.)  Plaintiff was also examined at the UCSD
4 Cardiology Clinic on December 7, 2005 and on October 12, 2007–during which Drs.
5 Raisinghani and Katsev found his cardiac condition to be "stable."  (*Id.*)

After reviewing Plaintiff's medical records, various diagnoses and prognoses of his treating doctors and clinical reports, Dr. Murphy concluded that:

> ... Mr. Willis is a 50 year[-old] male with a long history of Sarcoid lung disease, polysubstance drug abuse, hypertension and a well[-]compensated mildly dilated cardiomy[o]pathy probably due to a combination of drug abuse and hypertension.  His care has been appropriate and timely.  Because he is well compensated, with only a moderate reduction in LVEF, cardiac transplantation and/or implantable defribrillator are not considerations.  [A] [p]acemaker is not indicated because there is no history of symptomatic bradycardia.

(*Id.*; *see also* Murphy Decl. ¶¶ 5-9.)  Murphy further concluded that the various diagnosis and prognoses of Plaintiff's treating doctors are "within the standard of care," Plaintiff was "not injured by the medical treatment he received at R.J. Donovan Correctional Facility," that he "did not require a special diet," and that, in his expert opinion, the medical treatments Plaintiff claims to require are *not* "reasonable, necessary or within the standard of care." (*Id.* ¶¶ 14-17.)

### III.

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**A.     FED.R.CIV.P. 56 Standard of Review**

Summary judgment is proper where there is no genuine issue of material fact in dispute and the moving party has shown it is entitled to judgment as a matter of law. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing FED.R.CIV.P. 56(c)).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

/ / /

1  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED.R.CIV.P. 56(c)); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

   If the moving party meets its initial responsibility, the burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Bias*, 508 F.3d at 1218. To avoid summary judgment, the non-moving party is "required to present significant, probative evidence tending to support h[is] allegations," *Bias*, 508 F.3d at 1218 (citations omitted), and must point to some evidence in the record that demonstrate "a genuine issue of material fact [which], with all reasonable inferences made in the plaintiff[]'s favor, could convince a reasonable jury to find for the plaintiff[]." *Reese v. Jefferson School Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000) (citing FED.R.CIV.P. 56; *Celotex*, 477 U.S. at 323); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The opposing party cannot rest solely on conclusory allegations of fact or law. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, to demonstrate a genuine issue requiring trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587 (citation omitted).

   The evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).

   Because it is relevant in this case, the Court also notes it "does not have a duty to search for evidence that would create a factual dispute." *Bias*, 508 F.3d at 1219 (citing *Carmen v. Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001)). In *Carmen*, the Ninth Circuit found it "unfair" to the require the district court to "examine the entire file for evidence establishing

1  a genuine issue of fact, where the evidence is not set forth in the moving papers with adequate
2  references so that it could be conveniently found." *Id.*; *see also Forsberg v. Pacific N.W. Bell*
3  *Tel. Co.*, 840 F.2d 1409, 1417-18 (9th Cir. 1988) (district court is "not required to comb the
4  record to find some reason to deny a motion for summary judgment"). This is true even where
5  the non-moving party is proceeding in pro se. *See Bias*, 508 F.3d at 1219 (affirming summary
6  judgment for defendants where pro so plaintiff "failed to present any evidence in opposition"
7  and expressly rejecting pro se litigant's argument that the district court "should have searched
8  the entire record to discover whether there was any evidence [to] support[] her claims" because
9  she was proceeding without counsel). "A district court lacks the power to act as a party's
10 lawyer, even for pro se litigants. *Bias*, 508 F.3d at 1219.

   **B.     Defendants' Arguments**

12      Defendants seek summary judgment solely on Plaintiff's failure to "designate any expert
13 qualified to offer testimony in support of his claims." (Defs.' Mot. at 2.) Because they *have*
14 designated Dr. Murphy as their medical expert, who in his sworn Declaration attests to the
15 reasonableness of Plaintiff's medical care, Defendants claim no genuine issue of material fact
16 exists to show they caused Plaintiff any injury. (*Id.* at 5-6.)

17      As a preliminary matter, the Court notes both Plaintiff's Amended Complaint and
18 Defendants' Motion are sparse, and the relevant and material facts in this case are far from
19 clear. This is due, in part, to Plaintiff's pro se status, the medical nature of his claims, and his
20 failure to designate an expert witness. While the Court must, and does, liberally construe
21 Plaintiff's pleading, and all admissible facts in the record in light most favorable to him, *see*
22 *Haines v. Kerner*, 404 U.S. 519-20 (1972); *Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d
23 621, 623 (9th Cir. 1988), Plaintiff's Amended Complaint–which supersedes his original
24 Complaint--is barely comprehensible, is not verified under penalty of perjury and fails to
25 / / /
26 / / /
27 / / /
28 / / /

1  expressly incorporate by reference any of the medical records and inmate appeal exhibits he
2  submitted in support of his original pleading.[10]  *See* S.D. CAL. CIVLR 15.1.

3  In addition, while both parties propounded and engaged in protracted and sometimes
4  acrimonious discovery disputes, *see e.g.,* Doc. Nos. 48, 72, 80, 84, the only admissible evidence
5  offered in support of summary judgment is the Declaration of Defendants' designated expert,
6  Franklin L. Murphy, M.D., *see* Doc. No. 84 at 10-11, and one of the documents Plaintiff has
7  submitted in Opposition which he entitles a "Declaration [of] Undisputed Facts of Evidence"
8  and which is signed by him "under penalty and [sic] perjury." *See* Doc No. 94 at 1, 5; *see also*
9  *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002) (trial court may only consider
10 admissible evidence in ruling on a motion for summary judgment). Plaintiff's "Declaration"
11 however, while it does make reference to exhibits he attached to his original Complaint, is not
12 a true affidavit insofar as it sets forth no facts "made on personal knowledge" which "would be
13 admissible in evidence," as required by FED.R.CIV.P. 56(e), and it offers only argument as to
14 the professional competence of Dr. Murphy, whom Plaintiff calls Defendants' "so-called
15 expert," and the credibility of his testimony. *See* Doc. No. 94 at 4-5. Plaintiff, however, is not
16 a doctor and has failed to contradict Dr. Murphy's expert testimony with that of a designated
17 expert of his own, or any other independent admissible evidence which might provide support
18 for his claims. Given these procedural difficulties, the Court now turns to the substantive law
19 governing Plaintiff's claims.

20  / / /
21  / / /

---

[10] In at least two of the documents Plaintiff has submitted in opposition to summary judgment [Doc. Nos. 89, 94], Plaintiff *does* refer to documents he attached as exhibits to his original Complaint, which was filed on November 16, 2004, but dismissed sua sponte on January 19, 2005 pursuant to 28 U.S.C. § 1915(e)(2) [Doc. No. 3]. As noted above, Plaintiff's Amended Complaint, which is now the operative pleading, did not include any of the medical records or other exhibits submitted in support of his original pleading. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989) ("[A]n amended pleading supersedes the original."). However, because Plaintiff mentions these exhibits in his opposition, the Court hereby grants him permission to incorporate the exhibits filed in support of his original complaint as if they were attached to his amended pleading. *See* S.D.CAL. CIVLR 15.1 ("All amended pleadings shall contain copies of all exhibits referred to in such amended pleadings. Permission may be obtained from the court, if desired, for the removal of any exhibit or exhibits attached to prior pleadings, in order that the same may be attached to the amended pleading.").

## C. Eighth Amendment Inadequate Medical Treatment

Prison officials violate a prisoner's Eighth Amendment right to be free from cruel and unusual punishment if they are deliberately indifferent to the prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). To succeed on a deliberate indifference claim, a plaintiff must demonstrate facts sufficient to prove that he has or had a serious medical need and that a particular defendant acted with deliberate indifference to that need. *See Estelle*, 429 U.S. at 104-5.

A prisoner must satisfy both objective and subjective elements to establish an Eighth Amendment violation. *Farmer v. Brennan*, 511 U.S. 825, 834-837 (1994). To establish the subjective component of a deliberate indifference claim, "an inmate must allege sufficient facts to indicate that prison officials acted with a culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 302 (1991). A prison official must have actual knowledge of an "excessive risk to inmate health and safety," possessing both the facts from which an inference of serious risk to health and safety could be drawn and then drawing that inference. *Farmer*, 511 U.S. at 837. Even gross negligence, without more, does not constitute "deliberate indifference." *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

The indifference to medical needs must also be substantial; inadequate treatment due to malpractice, or even gross negligence, does not amount to a constitutional violation. *Estelle*, 429 U.S. at 106; *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) ("Deliberate indifference is a high legal standard.") (citing *Hallett v. Morgan*, 296 F.3d 732, 1204 (9th Cir. 2002); *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990)).

Moreover, a mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay or denial was harmful. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985); *Hunt*, 865 F.2d at 200 ("[D]elay in providing a prisoner with dental treatment, standing alone, does not constitute an Eighth Amendment violation."). The court must also focus on the seriousness of the prisoner's medical needs and the nature of the defendants' response to those needs. A "serious" medical need exists if the

///

failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104.

Particularly relevant in this case in the well-settled principle that differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). In addition, in any civil rights case, the plaintiff must establish a causal link between the defendants' conduct and the alleged injury. Without causation, there is no deprivation of a plaintiff's constitutional rights. *Rizzo v. Goode*, 423 U.S. 362, 370-371 (1976); *Estate of Brooks v. United States*, 197 F.3d 1245, 1248 (9th Cir. 1999) ("Causation is, of course, a required element of a § 1983 claim.").

### D.  Application to Plaintiff's Case

Here, viewing the evidence presented in the light most favorable to Plaintiff, the Court finds that no genuine issue of material fact exists to support Plaintiff's claims that Defendants Ritter, Raupe or Grannis violated either the ADA or were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.

While there is no dispute that Plaintiff suffers from medical conditions which are serious, *see Estelle*, 429 U.S. at 104; no evidence in the record supports Plaintiff's unsworn allegations that Defendants acted with deliberate indifference by either administering his health care, or reviewing his administrative appeals regarding the sufficiency of his treatment. In fact, Dr. Murphy's Declaration and medical opinion, which is based on a review of Plaintiff's medical history since 2002, and which concludes that Plaintiff's treatment was reasonable and within the medical standards of care applicable to his condition is the *only* admissible evidence before the Court. Instead of contradicting this testimony with either contradictory expert testimony of his own, or even pointing to specific evidence in the record which might undermine Dr. Murphy's conclusions, however, Plaintiff resorts only to unsupported claims that the signature of Dr. Murphy on his Report and Declaration do not match, and that his testimony is somehow suspect because his office is near counsel for Defendants. *See* Pl.'s Suppl. Response in Opp'n to Summ. J. [Doc. No. 91] at 5.

However, regardless of the seriousness of Plaintiff's cardiac condition, the mere fact that he vehemently disagrees with Defendants' rejections of his inmate appeals regarding what he apparently believes is a need for a heart transplant is not enough to violate the Eighth Amendment. *Sanchez*, 891 F.2d at 242; *see also Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (a difference of opinion between prisoner and his doctors does not constitute deliberate indifference). In fact, Plaintiff's own exhibits show that over the course of his incarceration and dating back to 2002, he has been examined, treated and monitored by prison medical personnel, referred to outside doctors specializing in cardiology, pulmonology, ophthalmology and dermatology, and as of May 2004, had undergone "two ECHO cardiograms, ... a heart cauterization, [an] endomyocardial biopsy, myocardial perfusion stress test, multiple chest x-rays, spirometry, EKGs and a chest CT." (*See* Compl. at 18, Ritter Mem. dated May 14, 2004). The mere fact that Plaintiff apparently believes his condition further requires an organ transplant, which Dr. Murphy has testified is not medically indicated, is simply not enough to violate the constitution. *See* Murphy Report, Defs.' Mot. for Summ. J. at 27 (noting that "[b]ecause he is well compensated, with only moderate reduction in left ventricular ejection fraction, cardiac transplantation and/or implantable defribrillator are not considerations.". Instead, this "is a classic example of a matter for medical judgment," and as such cannot provide the basis for a claim of cruel and unusual punishment. *Estelle*, 429 U.S. at 107.

Moreover, Plaintiff has pointed to no evidence in support his claim to having been unconstitutionally denied any medically recommended "organ transplant" or surgery of any kind. *See* Amend. Compl. at 4; *Estelle*, 429 U.S. at 104-05 (noting that deliberate indifference can be manifest if a prison official intentionally denies, delays or interferes with necessary treatment prescribed by a doctor causing the prisoner harm). And while the Court has no obligation to conduct its own independent search of the record, *see Bias*, 508 F.3d at 1219, it has done so without finding any evidence whatsoever which might show Plaintiff was ever considered, recommended for or denied organ transplantation.

On the other hand, Dr. Murphy, the only person competent to testify as to Plaintiff's medical condition testifies that Plaintiff's treatment was within medically accepted standards

of care. *See* Murphy Decl. ¶ 14. Plaintiff disagrees; yet he has fails to supply the Court with any affidavits or depositions of medical experts qualified to contradict Murphy's opinion and has offered nothing more than his own conclusory assertions that an organ transplant and/or a cardiac diet are required in order to satisfy the Eighth Amendment. *See Berg*, 794 F.2d at 459 (party opposing summary judgment cannot rest solely on conclusory allegations of fact or law).

Therefore, the Court finds that no triable issue of fact exists to show that any of the named Defendants acted with deliberate indifference to Plaintiff's medical needs in violation of the Eighth Amendment. Accordingly, Defendants are entitled to summary judgment as to all Plaintiff's Eighth Amendment claims pursuant to FED.R.CIV.P. 56(e).

**E.  ADA**

The Americans with Disabilities Act, 42 U.S.C. § 12132, applies in the prison context. *See* 42 U.S.C. § 12131(1)(B); *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998) (holding that state prisons fall squarely within the ADA's Title II's statutory definition of "public entity," which includes "any ... instrumentality of a State ... or local government.")

In order to state a claim under Title II of the ADA, however, a plaintiff must allege:

> (1) he 'is an individual with a disability;' (2) he 'is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities;' (3) he 'was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity;' and (4) 'such exclusion, denial of benefits, or discrimination was by reason of [his] disability.'

*O'Guinn v. Lovelock Correctional Center*, 502 F.3d 1056, 1060 (9th Cir. 2007) (citing *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (quoting *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002) (per curiam)). Punitive damages are not available in private suits brought under § 202 of the ADA (prohibiting discrimination against the disabled by public entities). *Barnes v. Gorman*, 536 U.S. 181, 189 (2002); *Mark H. v. Lemahieu*, 513 F.3d 922, 930 (9th Cir. 2008).

Here, Plaintiff invokes the ADA several times, but nowhere has he pleaded or pointed to proof that, even assuming his medical condition is a qualified disability, that he has been

excluded from participating in, or benefitting from any service, program or activity to which he would otherwise be entitled because of his disability. *O'Guinn*, 502 F.3d at 1265. Therefore, without more, Defendants are also entitled to summary judgment pursuant to FED.R.CIV.P. 56(c) as to Plaintiff's ADA claims.

## IV.
### CONCLUSION AND ORDER

For all the reasons set forth in the Order the Court hereby **GRANTS** Defendants' Motion for Summary Judgment [Doc. No. 84] in its entirety. The Clerk of the Court is further **DIRECTED** to enter Judgment for Defendants and close the file.

**IT IS SO ORDERED.**

DATED: March 26, 2008

**WILLIAM Q. HAYES**
United States District Judge